RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
BENJAMIN F. J. NEMEC
Assistant Federal Public Defender
Nevada State Bar No. 14591
Las Vegas, NV 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Ben_Nemec@fd.org

Attorney for Idriss Qibaa

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| United States of America, | Case No. 2:24-cr-00175-RFB-MDC |
| Plaintiff, | **Sentencing Memorandum** |
| v. | |
| Idriss Qibaa, | |
| Defendant. | |

On July 29, 2024, Mr. Qibaa entered Nevada Southern Detention Center. Mr. Qibaa had never spent a prolonged period of time in custody, let alone at a federal facility. When he entered, Mr. Qibaa was loud, abrasive, and defiant. He was also dealing with unmitigated bipolar and substance abuse disorder. Mr. Qibaa was spiraling down a dark path as he would drink an entire bottle of tequila everyday and providing social media services to drug dealers and gun traffickers.

According to Mr. Qibaa, his pretrial detention saved his life.

Mr. Qibaa, sober—both from his substance abuse disorder and his self-defeating life outlook—for the first time in his life, sees his path clearly. Mr. Qibaa is a different man than when he entered Nevada Southern Detention Center. As a result, he respectfully requests one year and a day in custody.

## I. Background

### A. Mr. Qibaa was treated like an outsider where weakness was harshly punished.

Mr. Qibaa was born in Morocco on June 10, 1996.[1] He quickly left Morocco because his family sought "a better life" when he was three years old.[2]

The better life was nevertheless difficult for Mr. Qibaa. Mr. Qibaa was "physically abused by [his] father' until Mr. Qibaa "was more vocal and older."[3] When his mother became involved, his mother would suffer abuse.[4] Mr. Qibaa's constant exposure to his father's physical abuse taught him that dominance was key and weakness would be punished. Indeed, one of the reasons Mr. Qibaa went to the dentist is because Mr. Qibaa had so many missing teeth from his father's constant abuse. One of the weaknesses Mr. Qibaa's father couldn't accept was Mr. Qibaa's bipolar diagnosis.[5] Mr. Qibaa was prescribed medication but his father prevented Mr. Qibaa from taking that medication.[6]

This lesson carried through high school. Mr. Qibaa was bullied in Junior High School and High School, and had difficulty paying attention and focusing in

---

[1] PSR ¶ 130.
[2] PSR ¶ 131.
[3] PSR ¶ 138.
[4] PSR ¶ 138.
[5] PSR ¶ 150-151.
[6] PSR ¶ 151. The PSR relays that Mr. Qibaa's "father disagreed with the diagnosis and Qibaa did not use the medication he was prescribed." That would suggest Mr. Qibaa had agency over the use of the medication, which is not true.

2

class.[7] Balancing the abuse from his father with Mr. Qibaa's desire to find "validation and acceptance from his father,"[8] Mr. Qibaa was left adrift in finding purpose in his life.

Mr. Qibaa first tried filling the void with alcohol. He started drinking when he was 15 and continued until he took a shot of tequila the morning he was arrested.[9] Despite his untreated bipolar disorder, his volatile home life, and his substance abuse disorder, he still graduated high school and was gainfully employed in construction.[10] He was a general contractor for five years with Twin Builders and Remodeling.[11]

During that time, he met and married his wife.[12] Unfortunately, like many newly married young couples, they ran into financial trouble. They spent above their means and quickly watched their bank account deplete as they juggled credit cards and paychecks. Mr. Qibaa, once again, in his mind, showing the weakness his father barbarously punished, sought to remedy the situation—not by asking his new family to lower their standard of living, but by trying to use his natural savvy for social media and technology.

### B. Mr. Qibaa founds "Unlocked4Life" and allows his demons to get the better of him.

Enter Unlocked4Life. Unlocked4Life was originally created to be a social media consulting firm which advised clients how to get the most out of their social media presence. He entered the same arena as websites like Hacked.com,

---

[7] PSR ¶ 136.
[8] PSR ¶ 139.
[9] PSR ¶ 153.
[10] PSR ¶ 164-165.
[11] PSR ¶ 164.
[12] PSR ¶ 134.

3

1 providing additional followers, likes, and unblocking of accounts. Unfortunately, 2 it quickly spiraled out of control. The same vendors who would provide his 3 clients with more likes and followers also offered the ability to block others' 4 accounts. Mr. Qibaa found himself embroiled in the shadier side of social media, 5 as drug dealers and gun traffickers sought to block competitors. But Mr. Qibaa 6 found he could provide his new wife (and incoming daughter) a better life than he 7 had.

8   So, he found a way to advertise and provide ways to block and unblock 9 social media accounts. Mr. Qibaa wouldn't hack into the system and block and 10 unblock these accounts himself. Instead, he acted as a middle man—finding 11 contacts through Telegram that could block or unblock accounts through 12 strategic mass reporting of a targeted account. Mr. Qibaa would simply charge a 13 premium for acting as the middle man and acted as the public face.

14   Unfortunately, Mr. Qibaa's drinking took this practice to new heights. He 15 would wake up to messages he sent while blackout drunk. Mr. Qibaa is 16 ashamed. He knows he is perpetuating a cycle of fear, violence, and dominance-17 above-all-else that his father instilled, and he wants to be better. But his demons 18 get the best of him when he is drunk. Mr. Qibaa would tell himself he is doing it 19 to known Instagram drug dealers, gun suppliers, and other purveyors of the 20 criminal underworld, and rationalize it that way, but he knows what he did is 21 wrong.

22 ████████████████████████████████████████████
23 █████████████████████████████████████████████████
24 █ █ ███████████████████████████████████████████
25
26 ─────────────────────────
    █ ████████

███████████████████████████████████

███████████████████████████████████

████████████████

  **C. Mr. Qibaa is arrested and placed in pretrial detention.**

  On July 29, 2024, Mr. Qibaa made his initial appearance.[15] Mr. Qibaa was ordered detained.[16] As someone who spent minimal time in custody, Mr. Qibaa was shocked. Even after Mr. Qibaa's Motion for District Judge Review of Magistrate Judge's Detention Order was denied,[17] Mr. Qibaa was still in denial.

  This made his transition from being a free man to in custody horribly difficult. The birth of his daughter made it even worse. Mr. Qibaa has missed all important milestones from his baby. Her first birthday, her first Christmas, first steps, first words, first real connections. Most parents would give anything to see those. Mr. Qibaa had to hear about those milestones second hand, or, if he was lucky, watch from a computer screen.

  Just like when Mr. Qibaa standing up to his father made the abuse stop, Mr. Qibaa thought if he lashed out at the prison officials, it would make the pain stop. It didn't. It got him into trouble.[18] He was never violent, but he was, at times, disrespectful. But it was to mask his suffering. He was placed into solitary multiple times because he was a suicide risk. His life was spiraling out of control, so Mr. Qibaa spiraled out of control.

---

████████████████████████████████████

[15] ECF No. 4.
[16] ECF No. 4.
[17] ECF Nos. 14, 22.
[18] PSR ¶ 6–16.

However, he eventually became accustomed to custodial life. His write-ups became less frequent and he began to settle down. Indeed, about a week and a half ago, Mr. Qibaa started working in the kitchen. Mr. Qibaa also started programming once he settled down and is currently enrolled in a Victim Impact class, and is on the wait list for even more.

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████

Mr. Qibaa credits his time away from addiction and the lack of constraints as saving his life. Mr. Qibaa recognizes he was heading down a very dark path. While he is in tremendous pain from the loss of precious moments with his daughter, he knows that, ultimately, he is going to be given a new lease on life. His pretrial custody snatched him from certain destruction.

Custody offers very little, especially to first time offenders. The little custody can offer—a clean break (that is attendant with financial destitution), forced obedience, and an understanding of the severity of one's actions—has already happened. Mr. Qibaa's growth will need to happen outside of a prison cell.

**II.  Argument**

The sentencing factors support a sentence of one year and a day. This Court must consider the factors promulgated by 18 U.S.C. § 3553(a) in addition

to the advisory Guidelines range.  *United States v. Booker*, 543 U.S. 220, 245, 259-60 (2005).  Section 3553(a) requires courts to consider, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed-

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

### A. Nature and circumstances of the offense and history and characteristics of the defendant.

The nature and circumstances of the offense are serious.  Mr. Qibaa made threats against individuals online and extorted them for money.  However, these threats, and the actions Mr. Qibaa took, were bombastic, exaggerated, and over-the-top.  While certainly it made it frightening for those who didn't know what Mr. Qibaa was going through, these bombastic, exaggerated, and over-the-top threats are exactly what can be expected from someone dealing with an unmitigated bipolar and substance abuse disorder.

Mr. Qibaa came to this country at a very young age.  He was an outsider and was treated as one, both at home and at school.  Mr. Qibaa suffers from untreated bipolar and substance abuse disorder.[19]

---

[19] Mr. Qibaa completed "Alcohol Information School" in 2021.  PSR ¶ 154. This was during the pandemic and completed online.  This is not a substitute for actual substance abuse treatment.

7

Despite these deep hurdles, this will be Mr. Qibaa's first felony conviction. Indeed, his criminal history is replete with traffic convictions. Certainly, some of the factual allegations indicate Mr. Qibaa may have gotten out of control when handling those issues, but those once again are indicative of untreated bipolar and substance abuse disorder. Indeed, during most of those traffic violations, Mr. Qibaa was gainfully employed in construction.

That should give this Court confidence that Mr. Qibaa's actions are a symptom of Mr. Qibaa's issues, rather than a result of something inherent in Mr. Qibaa's character. That alone weighs against a lengthier custodial sentence.

### B.  A year and a day will reflect the seriousness of the offense.

Mr. Qibaa has already lost most of what he would lose to a custodial sentence. It's hard to imagine a more severe punishment to a new father than to have them miss out on key moments in their daughter's life. And Mr. Qibaa has already had to hear about those key moments second hand as he is torn away from his daughter. Mr. Qibaa understands it is hard for this Court to know how close he is to his family, and how much his daughter means to him. He is confident that the family support at the sentencing hearing will show this Court how much he has lost already.

Perhaps more difficult than not watching his daughter's milestones was watching his family struggle. Mr. Qibaa was the breadwinner. But he watched his wife and daughter go to food banks and get on food stamps. He has to live with the fact that he caused their suffering. He knows it's on him. Mr. Qibaa has to live with his wife getting up in the middle of the night, freaking out and crying from a prior break-in that Mr. Qibaa was unable to prevent. Mr. Qibaa's heart breaks when his daughter grabs photos of her dad and gives them to his wife to try to calm her down.

Additional time over a year and a day is unneeded. Mr. Qibaa's custodial time thus far has already taken everything he cares about from him. Mr. Qibaa anticipates his family will attest to how his custodial time thus far has brought back their beloved family member back.

### C. Remedial measures are best handled through supervised release rather than a custodial sentence.

Mr. Qibaa's actions were propelled by an unmitigated mental health condition and substance abuse disorder. Those obstacles will remain unmitigated in custody.

Indeed, in custody, Mr. Qibaa will remain in close proximity to those with the criminal element. While the custodial time thus far has softened Mr. Qibaa's sharp edges, a lengthy custodial sentence will barrel head first into diminished returns and will almost assuredly backfire, delaying Mr. Qibaa's much needed rehabilitation.

### D. The guidelines are a poor guide for culpability.

The sentencing guidelines are useless for this Court to determine culpability.

Mr. Qibaa asks this Court to vary downward based on a reasonable policy disagreement with his guidelines. Sentencing courts have broad discretion to vary from the sentencing guidelines. *United States v. Booker*, 543 U.S. 220, 244 (2005). While the courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the lowest sentence necessary to accomplish the purposes in 18 U.S.C. § 3553(a). The overriding principle and basic mandate of § 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing: retribution, deterrence, incapacitation, and rehabilitation. U.S.S.C. § 3553(a)(2).

### 1.  The impact of *Rita*, *Kimbrough*, and *Gall*.

The Supreme Court explained in *Rita v. United States*, 551 U.S. 338 (2007), that a district court remains free to reject the advisory sentencing range "perhaps because (as the guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends the individual guidelines to apply," or, the Court continued, "perhaps because the guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Id.* at 351; *see also Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007). The Court recognized that a party may "contest[] the guidelines sentence generally under § 3553(a)—that is, [he may] argue[] that the guidelines reflect an unsound judgment." *Rita*, 551 U.S. at 357.

The sentencing guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in § 3553(a). *Kimbrough*, 552 U.S. at 109–10; *Gall v. United States*, 552 U.S. 38, 46 (2007). The Court further clarified that the guidelines cannot be a substitute for a sentencing court's independent determination of a just sentence based on consideration of the statutory sentencing factors. *Nelson v. United States*, 555 U.S. 350, 351 (2009). The guidelines are not only not mandatory on sentencing courts—they are also not presumed to be reasonable. *Nelson*, 555 U.S. at 352. A sentencing court may not rely on the guidelines range as a default to be imposed absent a basis to impose a sentence outside that range. *Id.* Rather, a court must weigh each factor and impose the lowest sentence necessary in consideration with the § 3553(a) factors. *Id.*

The Court allowed an appellate presumption of reasonableness for within-guidelines sentences based on the assumption that the Commission carried out its duty to utilize empirical evidence and analyze the § 3553(a) factors in

assigning recommended sentences to certain offenders. *Rita*, 551 U.S. at 348 (noting that the result of the Commission carrying out its statutory duty is "a set of guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice"). But, the Court recognized, when the Commission fails to fulfill its role by premising a guideline on considerations other than empirical evidence and the § 3553(a) factors, the sentencing court may give that guideline less deference. *Id.* The Court in *Kimbrough*, for example, held that sentencing judges may disregard the guidelines' sentencing recommendations for crack-cocaine offenses based on the crack/powder cocaine sentencing disparity in the guidelines. 552 U.S. at 109–10. This decision was motivated by the Commission's failure to utilize empirical evidence in enacting the crack-cocaine guidelines. *Id.* (holding that where a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion for a sentencing court to conclude that the recommended sentence fails to achieve the purposes of § 3553(a), even in "a mine-run case"); *Gall*, 552 U.S. at 46 n.2 (2007) ("Notably, not all of the guidelines are tied to empirical evidence.").

### E. The extortion guidelines are poor proxies for culpability and offense seriousness.

The extortion guidelines overinflate the time sufficient under 18 U.S.C. § 3553(a). For example, Mr. Qibaa will receive two additional offense levels because he demanded more than $95,000 under U.S.S.G. § 2B3.2(a).[20] The most infamous, and illustrative, example in the guidelines of loss amounts impacting the end guideline range is for fraud. The Commission's reasoning for the fraud guidelines gives insight into why exactly § 2B3.2(a) is deficient.

---

[20] PSR ¶ 48.

11

The Commission has explained that actual and intended loss are designed to function as rule-based proxies for the seriousness of the offense and the culpability of the offender, respectively. § 2B1.1 cmt. Background; U.S. Sentencing Guidelines Manual app. C, vol. II (2015). In the Commissioner's view, "[s]o long as higher actual losses are associated with greater harm and higher intended losses with greater culpability, the loss-based proxies will further the Commission's goal of uniform and predictable sentences" while also "grading defendants proportionally by the harm they imposed and their culpability." *Id.* at ch. 1, pt. A ("[T]he Commission developed these guidelines as a practical effort toward the achievement of a more honest, uniform, equitable, proportional, and therefore effective sentencing system.").

But actual loss and intended loss are not good proxies for culpability or offense seriousness. By measuring harm and culpability with respect to actual and intended loss, these rules are based on generalizations that necessarily fail to capture the full range of facts that might be relevant to evaluating harm and culpability in a given case. Daniel S. Guarnera, *A Fatally Flawed Proxy: The Role of Intended Loss in the U.S. Sentencing Guidelines for Fraud*, 81 MO. L. REV. 715 (2016). Unfortunately, the Commission "has nowhere stated, much less explained, why these quantifiable differences in harm caused are *appropriate* measurements of the extent of individual culpability, or why they are more significant than other sentencing factors that receive less weight in guidelines sentencing calculations." K ate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998).

Actual loss is certainly not a perfect proxy for offense seriousness. Guarnera, *supra* at 739. For example, a crime that causes each of ten retirees to lose $100,000 might be more serious—to both society and the victims—than one that causes each of 100,000 wealthy investors to lose $10. *Id.* But under the

12

loss table, the guideline sentence for each crime would be the same. *See* U.S.S.G. § 2B1.1. The loss calculation also excludes nonpecuniary harms such as emotional or reputational injuries, even though they can significantly affect the harmfulness of an offense. § 2B1.1 cmt. n.3(A)(iii) (explaining that "loss" under the fraud Guidelines "does not include emotional distress, harm to reputation, or other non-economic harm").

Intended loss only incorporates the hypothetical pecuniary harm the defendant intended to inflict. Guarnera, *supra* at 740–41. The question of what makes one defendant more morally blameworthy than another is complex, and the Commission has not endeavored to define culpability's scope.[21] As such, intended loss is a "fatally flawed" proxy for culpability. Guarnera, *supra* at 719. Culpability is too complex and heterogenous an inquiry to be accurately represented by the pecuniary harm that the defendant intended to inflict, and therefore the sentencing enhancements it triggers are not well calibrated to the holistic culpability of the offender. *Id.* Although the Commission adopted a new "purposeful loss" amendment in 2015—ostensibly to improve the correlation between culpability and intended loss—it is likely to make the "fit" between them even more problematic by excluding a significant range of highly culpable conduct: criminal acts that the defendant subjectively *expected* would cause losses, but that were not undertaken with the *purpose* of imposing them. *Id.*

And here, treating extortion and robbery the same when it comes to threatened amount falls even further afield from logic and reason. U.S.S.G. §

---

[21] The guidelines expressly cabin the culpability inquiry in several ways as a matter of policy. For example, a defendant's educational and vocational skills, drug dependence, family ties and responsibilities, prior history of good works, and lack of guidance as a youth are all considered either absolutely or presumptively irrelevant in determining whether a departure is warranted. *See* U.S.S.G. §§ 5H1.2, 5H1.4, 5H1.6, 5H1.11, 5H1.12.

13

2B3.2(b)(2) instructs the calculator to reference the loss table for robbery. In doing so, it affords the same moral weight to both losses. That jump fails even a cursory examination. A robber going into a bank and demanding a teller to provide $ 96,000 should not be given the same offense level increase as someone from behind a computer screen doing the same.

And that problem—the technology problem—is exactly why the extortion guidelines as a whole are poorly equipped to deal with extortion over the internet. In Mr. Qibaa's case, he would commit his offenses sitting in a chair with his moral cognition severely hampered by alcohol. Mr. Qibaa did not have to stand in front of a person when he committed his offenses, look into their faces as he made his demands. He instead did it from his phone, where technology makes the moral weight of his actions easier to ignore. Mr. Qibaa, of course, understands his actions deserve consequence. But the guidelines are ill-equipped to captured those consequences.

Mr. Qibaa requests this Court vary downward because the extortion guidelines inflate the appropriate sentence.

### III.  Restitution

The PSR does Mr. Qibaa a disservice. It states for restitution, Mr. QIbaa "contends he is not responsible for the restitution amounts referenced in the paragraphs."[22] Mr. Qibaa's objection did not have anything to do with whether he is responsible. Mr. Qibaa's objection was, in whole, that "[t]he government will not be able to meet its burden proving restitution due to the plea agreement. *See United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008) (holding the government bears the burden of proving restitution."

---

[22] PSR ¶ 60.

That remains true.  Mr. Qibaa requests this Court not order any restitution.

IV. **Conclusion**

Mr. Qibaa requests this Court sentence him to a year and a day in custody.

DATED: May 15, 2025.

        RENE L. VALLADARES
        Federal Public Defender

By:         */s/Benjamin F. J. Nemec*
        BENJAMIN F. J. NEMEC
        Assistant Federal Public Defender
        Attorney for Idriss Qibaa

15